Wesley et ux. *v.* Rhodes, Appellant.

Argued April 30, 1934.

Before Trexler, P. J., Keller, Cunningham, Baldrige, Stadtfeld, Parker and James, JJ.

*Henry Kauffman,* and with him *Louis Little,* for appellant.

*J. S. LaVictoire,* and with him *Frank C. Link,* for appellee.

OPINION BY STADTFELD, J., July 13, 1934:

This is an action of trespass for malicious prosecution based upon the wrongful arrest of the plaintiffs on two criminal charges: (1) the larceny of a diamond ring, and (2) for receiving stolen goods.

The defendant, J. C. Rhodes, at the times complained of, owned and operated a jewelry store at Homestead, Allegheny County. This store was, during defendant's absence, in charge of and managed by defendant's son, J. M. Rhodes. In 1930 one Harry Amsler bought at defendant's store from the latter's son, a diamond ring for the price of $175 on a bailment lease contract. He made a small payment on the ring and then defaulted. After procuring the ring he gave the same as a present to Annamae Wesley, one of the plaintiffs, then a single woman. Upon default in payment, the defendant turned the account over to one Laird, operating a collection agency, who had been making collections for defendant a number of years. Laird, upon information obtained from Amsler, traced the ring to plaintiffs and called upon them at their residence. Laird testified that in the conversation with Annamae Wesley, of the plaintiffs, she first denied that she ever had the ring but finally admitted that she had received it but didn't have it at this time, that she had given it to her husband and he had "hocked" it. Laird told them that he was interested in the collection of the ring or the money and that it was up to them to see that he got either one of them, because they had received the ring. Neither of the plaintiffs were known to defendant nor had they had any dealings with him. Laird thereupon made an information, signing it "G. M. Laird, for J. C. Rhodes," charging them with larceny of a diamond ring and

receiving stolen goods. Upon the warrant issued on this information, defendants were arrested and thereupon gave bail for their appearance. Upon the trial of the case in criminal court, defendants were acquitted on a directed verdict in their favor. Defendant did not appear as a witness against plaintiffs, either at the preliminary hearing before the aldermen or before the grand jury, or at the trial in criminal court. At the trial, Laird testified that his authority was to collect the accounts placed with him in his own method. That he got this general authority from J. C. Rhodes, the defendant, but had no special instructions in this particular case. He claimed that he had an assignment of all accounts placed with him, but that he was nevertheless accountable for any moneys he received thereon. He stated that he signed the information in the names stated so that if there was any money paid on the account, it would come through his hands instead of through defendant. Defendant, at the trial, denied that he ever authorized the arrest of plaintiffs, and stated that his son had general supervision over the collection of accounts, and represented him as his manager and agent.

The court refused binding instructions in favor of defendant and submitted the case to the jury with instructions to determine, from the testimony of defendant, whether the authority which he had given to Laird, according to the latter's statement, contemplated the arrest of delinquent debtors any time Laird saw fit, and that if they found no such authority, or that the defendant did not contemplate, know or realize, or ought to have known that such arrest might follow, the verdict should be for defendant; otherwise for plaintiffs.

The jury found in favor of plaintiffs in one verdict in the sum of $350. Motions for new trial and for judgment n. o. v. were overruled, in an opinion by

REID, J., and judgment entered on the verdict. From that judgment this appeal was taken.

The controlling question in this case is as to what authority was vested by defendant in Laird in connection with the collection of delinquent accounts.

According to the testimony of defendant, he was the owner of the store. He testified "We sell on leases, and when they become delinquent, my son has charge of looking up delinquencies. He makes an investigation and has entire charge of that department...... That is his end of the business."

Laird testified on cross-examination: "Q. Your agreement was, with the defendant, that after the accounts were in your hands, it was up to you to collect them in your own method. A. My own method, nothing at all to do with Rhodes." Re-direct: "Q. I understood you to say ...... that you had full charge and that you could do anything you pleased about these collections, and that you were given that authority by Mr. Rhodes here, is that right? A. Why, I had absolutely full charge of all accounts...... Q. In other words, your authority was to collect those accounts in your own method? A. Yes. Q. And you got authority from whom? A. From Mr. Rhodes. Q. Well, whatever you wanted to do, the authority you did get, you got from J. C. Rhodes? A. Yes, I have answered that."

There was some testimony by Laird of alleged assignments to him of accounts which were placed in his hands for collection, but if they were so assigned, it was evidently intended only to facilitate collection and not to pass title, because Laird was still accountable to the defendant for any moneys received thereon.

While defendant did not appear as a witness against plaintiffs, either before the alderman or in the criminal court, his son, J. M. Rhodes, did. There was also the testimony of Annamae Wesley, of the plaintiffs,

of a conversation with J. M. Rhodes, son of defendant, in which she stated: "It was this way: a couple of weeks after I received the ring, Mr. Rhodes, the one that was working in the store, come up to the store, the clothing store I was working in there, and he was up there, and I was pretty busy, and he said to me, 'I want that ring or you will give me the money, because the ring is not paid for and I am responsible for it and I want that money,' and I said 'I am very sorry, I have nothing to do with you, for I have not seen you. It was given to me as a gift. I never did buy it at the time'......".

While there was no testimony as to any express authority to make an arrest in this case, defendant evidently gave unrestricted authority to Laird as to the method he might pursue in enforcing collections. There was ample testimony from which the authority might be inferred. In addition there was no denial by the defendant of the authority in Laird to sign the information in the manner he did, viz: "G. M. Laird, for J. C. Rhodes."

The question is whether Laird acted within the scope of his implied authority. While the declarations of an agent are not proof of his authority his authority can be established by his testimony: Mahoning Valley Bread Co. v. B. & O. R. R. Co., 83 Pa. Superior Ct. 379; Hileman v. Falck, 263 Pa. 351, 106 A. 633.

The question of the agency of Laird for the purpose of making an information and causing the arrest of plaintiffs was a question of fact for the jury under the evidence, and it would have been error to withdraw the same from consideration of the jury.

Appellant also assigns for error the fact that one verdict was taken for husband and wife, plaintiffs, while under the Act of May 8, 1895, P. L. 54, separate verdicts should have been taken for each. We can not see that defendant was in any manner injured

414

thereby, so that it was at best harmless error for which we will not reverse.

The assignments of error are overruled and judgment affirmed.